Jimmy D. Lenard was duly indicted for the crime of aggravated assault and tried on April 18, 1987. The jury returned a verdict of guilty, whereupon he was sentenced to ten years in the Mississippi Department of Corrections with five years suspended.
Lenard filed a Motion For A New Trial which was denied.
Appellant appeals to this court and assigns five errors, of which only two (2) are significant for the purposes of this decision. Finding merit in Issue No. I, we reverse and order a new trial.
 STATEMENT OF THE FACTS
Christine Pasquale testified that on the night of January 10, 1986, her former boy friend, Jimmy Lenard (appellant below), broke into her house by kicking in the door, came down the hallway toward the bedroom swinging a knife, and went after David McCormick, who was spending the night with her. Prior to this incident, Ms. Pasquale claims that Lenard telephoned her three (3) times, informed her that he knew another man was with her, and threatened to kill her if he could get to them.
David McCormick testified that Jimmy Lenard kicked down the door, attacked him with a knife, and cut him seven or eight times.
Doris Lenard, mother of appellant, testified to being within hearing distance when the disputed telephone conversations took place. She contends that her son never threatened Ms. Pasquale.
Police officers Ricky Frizzell and Larry Bailey arrived on the scene and witnessed appellant and David McCormick coming out of the house. McCormick was bleeding and appeared to be running toward his truck. At the sight of the officers, appellant stopped his forward progress and handed the pocket knife to the officers at their command.
Appellant, Jimmy D. Lenard, testified he was shooting pool at the American Legion on the night of the incident when he received a call from Christine Pasquale. He told her he was busy in a partner game shooting pool and would call her back. At about 8:30 or 9:00 P.M. he went to his mother's house and called Ms. Pasquale. Appellant then testified he thought she wanted to see him so he told her he was coming down there. He claimed he was unaware that anybody else was there when he arrived, and he went in like he always did. He claimed he had a key even though he hadn't lived with Pasquale for about a month but would sometimes go there and spend the night. He claimed the entrance door was damaged when he helped move Ms. Pasquale into the house. "She had one of these double-door refrigerators and we skinned the door up pretty bad." After entering the house, appellant claims on cross-examination to have checked on Ms. Pasquale's eight year old daughter, then proceeded to Ms. Pasquale's room where on direct examination he testified as follows: *Page 95 
 Q. Who did you see first? Which one of the two?
 A. Both of them.
 Q. Did you see that there was a man there with her?
 A. Yes sir.
 Q. Were the lights on or off?
 A. They was off.
 BY MR. STALLINGS: Your Honor, it's his witness — let the witness tell the story. Mr. Crocker is doing the testifying.
 BY THE COURT: All right.
 Q. What was the condition of the lights?
 A. It was dark. The porch light was on —
 Q. Who was the man there with her, if you knew at that time?
 A. I didn't know him.
 Q. What was the first thing you saw when you saw the man?
 A. Well, they was in the bedroom. He was coming, you know, at me.
 Q. When you say coming at you, what do you mean?
 A. They was both coming out of the bedroom.
 Q. What did you do when you saw him coming at you?
 A. I told him to get out of there — you know, out of the house.
 Q. All right. What happened then?
 A. Me and him had a little scuffle there in the livingroom.
 Q. All right, what if anything happened about a knife?
 A. I had a knife in my coat pocket.
 Q. Let me ask you about that knife. How long had you had it?
 A. I don't know. My grand-daddy give it to me. I guess several years.
 Q. What if any trouble have you ever had before with that knife?
 A. I hadn't.
 Q. What was the purpose of you pulling out that knife, that night?
 A. He acted like he was going to swing at me, and I was defending myself. I didn't know whether he might have had something in his hand or not. I didn't know the boy.
 Q. Did you go in there with the purpose of hurting him?
 A. No sir.
 Q. At the time you pulled out the knife and you had the scuffle, what intention if any, did you have?
 BY MR. STALLINGS: Your Honor, I object. It's self serving.
 BY THE COURT: All right, I will sustain it.
 Q. Where were you when the officers from Bruce arrived?
 A. I was in the livingroom.
 Q. Who else was in there?
 A. David, the boy that was there. David McCormick. He had started out to his pickup. He was at his pickup when the law pulled up.
 Q. What had you done about chasing him out to this pickup?
 A. I was still in the livingroom.
 (Emphasis added).
In this state of the record, the learned trial judge nevertheless granted the state an instruction that "self-defense does not apply in this case." Conviction followed and Lenard appealed, assigning as Issue No. 1.
 ISSUE NO. 1 Whether the Trial Court Erred in Granting State Instruction No. S-3 Stating to the Jury that They Could Not Consider Self-Defense as a Defense in this Cause.
At the conclusion of this case, the trial court gave the following instruction (S-3) to the jury:
 The Court instructs the jury that self-defense does not apply in this case and you should not consider self-defense in your deliberation of this case.
Appellant directs this Court to his testimony put forth hereinbefore and contends that his testimony clearly shows that he was testifying that he was defending himself from an assailant who was advancing toward him and the jury had a right to consider his testimony as to whether his actions constituted self-defense without being *Page 96 
directly instructed by the court that they could not consider self-defense. The effect of the court allowing the state's instruction in this case — that the jury could not consider self-defense — was equivalent to instructing the jury to find the defendant guilty.
We begin our legal analysis by citing Wadford v. State,385 So.2d 951, 955 (Miss. 1980), for the general rule that where there is serious doubt as to whether a requested instruction should be given, doubt should ordinarily be resolved in favor of the accused.
Wadford is a case in which the defendant requested a jury instruction on self-defense but was denied same. Here, this is not so. Instead, it was the prosecuting attorney who requested and was granted Instruction No. S-3 which stated that the jury was instructed not to consider self-defense as a viable defense in this case.
Appellant submits that giving this instruction would be much stronger than the refusal of a self-defense instruction offered on behalf of appellant. This Court surmises that what appellant means by this statement is to say that with instruction S-3, the jury had no choice; they simply could not consider self-defense as a reason for defendant's actions. But if, instead, the instruction had not been granted and also defendant submitted an instruction requesting an instruction on self-defense, which, likewise, may have been denied, then in that case the jury could still have had an opportunity to use their common sense and impressions of the trial testimony to determine whether appellant was indeed defending himself. It follows that this would have been fairer to appellant. This reasoning strikes this Court as sound and logical.
This Court has reviewed all of the requested instructions, both from the state and from appellant, and would comment that at first glance it may seem strange that appellant never requested an instruction allowing the jury to consider the defense of self-defense, particularly in light of the fact that he would have this Court believe it was his main theory of the case. However, we suggest that even if appellant's counsel was prepared to offer an instruction at the close of the trial regarding self-defense, his effort would have been futile. Witness the following exchange between appellant's counsel and the trial judge with regard to whether Instruction S-3 should have been given:
 BY MR. CROCKER [counsel for appellant]: I certainly object to that, Your Honor. There was clear testimony that it was self defense.
 BY THE COURT: I don't recall any testimony that constitutes self defense.
 BY MR. CROCKER: He testified the man was coming at him and he defended himself. My understanding of what self defense is, it goes to the heart of the case, Your Honor.
 BY THE COURT: I am going to give it.
All of the state's instructions were handled by the court prior in time to appellant's instructions, so the above exchange took place prior to any discussion and/or rulings on appellant's instructions; therefore, it follows that given that the court had already decided to grant Instruction S-3 prior to even reaching the merits of appellant's submitted instructions, then it would have been futile for appellant's counsel to submit an instruction requesting a defense of self-defense. Counsel for appellant did the best thing available to him under the circumstances, and that is he objected to the admission of No. S-3, thereby preserving this issue for this Court to consider.
 At trial, an attorney on his oath is twice obligated. He must with warm zeal and all good fidelity advance the cause of his client. At the same time, he is expected to accept and respect rulings of the trial court once finally made. The tension in these two obligations is most felt by the lawyer when the trial judge rules against his client on a point where the lawyer's experience and knowledge inform him that the trial judge is wrong.
 When the trial judge makes a ruling adverse to a litigant, and where that litigant's lawyer has properly noted his objection, *Page 97 
that litigant and his lawyer are entitled to try the rest of the case on the assumption that the trial judge's ruling will not be disturbed on appeal. And, when that litigant reaches this Court we will not imply a waiver from the subsequent conduct which does nothing more than show the lawyer's obligatory respect for the trial judge while at the same time continuing as best be done the advancement of his client's cause.
Strong v. Freeman Truck Line, Inc., 456 So.2d 698, 711 (Miss. 1984), cited in Stringer v. State, 500 So.2d 928, 946 (Miss. 1986); Jones v. State, 461 So.2d 686, 702 (Miss. 1984).
Simply put, viewing the matter from the perspective of appellant, Lenard had gone to a house where he had previously lived with a young woman in response to a call from the young woman and, upon arriving there, was surprised by an individual who ". . . was coming, you know, at me," and he was defending himself by using the pocket knife which he had on his person and which he had owned for a period of years, having obtained same from his grandfather. Therefore, he submits that the factual situation in the present case would not create a circumstance as being one of "the few, very rare cases" where a trial court may properly deprive a defendant of the defense of self-defense.McMullen v. State, 291 So.2d 537 (Miss. 1974); Craft v.State, 271 So.2d 735 (Miss. 1973); Tate v. State,192 So.2d 923 (Miss. 1966); Coleman v. State, 179 Miss. 661, 176 So. 714
(1937), and Lofton v. State, 79 Miss. 723, 31 So. 420 (1901). We agree. The giving of this instruction was, in effect, the giving of a peremptory instruction to find appellant guilty.
Appellant readily admits that the jury might well have rejected his version of the events and agreed with the prosecuting witnesses' version which contradicted seriously the version set forth by Appellant. Had they done so, without being instructed that they could not consider self-defense, which was, in effect, appellant's version, appellant would now have no argument on this point. He would have been convicted by a properly instructed jury.
Whether to grant an instruction that the jury cannot consider self-defense or, for that matter, to grant an instruction allowing the jury to consider self-defense as a defense is an issue that this Court has confronted many times. The outcome, however, has not always been the same.
In the case at bar, there is direct conflicting testimony as to what happened on the night of January 10, 1986. It is obvious that if one believes Ms. Pasquale's version, then appellant is likely to be convicted of a crime. Adversely, if appellant's version of the incident is to be believed, a different outcome is reasonably possible. This is clearly a factual dispute which the jury is responsible and obligated to determine. But, the fact of the matter is that we agree with appellant's reasoning that the jury did not really have a choice but to convict appellant. The trial judge made the decision that there had been no evidence of self-defense presented to the jury and, therefore, Instruction No. S-3 was appropriately granted. The only legal basis for which this trial judge was possibly justified in granting S-3 was expressed by this Court in Wadford v. State, 385 So.2d 951, 955 (Miss. 1980), as follows:
 Self defense is a legal concept which must be supported by evidence to be available to a defendant in a homicide case.
This Court agrees with appellant that this is not one of "the few, very rare cases" where a trial court may properly deprive a defendant of the defense of self-defense. Instead, we hold that this is a case where appellant has testified that he was defending himself and his mother substantiated a critical part of his testimony. The chief prosecuting witness, along with the victim and the two arresting police officers, provided conflicting testimony. This is a factual dispute which the jury should resolve, not the trial judge. It is for the jury to determine the reasonableness of the ground upon which the defendant acts. Robinson v. State, 434 So.2d 206, 207 (Miss. 1983). It is not important whether *Page 98 
the trial judge thinks appellant's story is plausible. This is the jury's job. "Where there is serious doubt in the law as to whether a requested instruction should be given, ordinarily the doubt should be resolved in favor of the accused." Wadford,supra, at 955; Gambrell v. State, 92 Miss. 728, 46 So. 138 (1908). The case now under consideration fulfills the requirements for application of the rule. Instruction No. S-3 should not have been granted.
We direct the Bench and Bar to the astoundingly prophetic commentary, contained in Lofton v. State, 79 Miss. 723, 31 So. 420 (1901), on the question of whether a trial court should grant the state's instruction which impinges on the right to claim self-defense:
 This form of charge, declaring a defendant estopped to plead self-defense, is an exceedingly unwise one to be given. We have repeatedly condemned it, as shown by cases cited in the very able brief of counsel for appellant. It can never be proper, save in the few very rare cases where the case is such, on its facts, that a charge can be given embracing all the elements — not part of them, nor nearly all of them — essential to the estoppel. The old paths are the safe paths. The juries of the country can be safely trusted to find any defendant guilty whose case is really so bad as to estop him to plead self-defense, without resort — dangerous and unwise — to the metaphysical subtleties necessarily involved in the preparation of a proper charge of that sort.
Once more we repeat (hoping that "here a little and there a little, line upon line, and precept upon precept" may at last do their work) that if prosecuting attorneys will ask few and very simple charges, and trust more to the common sense and sound judgment of the juries of this country, they will expose their circuit judges to far less risk of reversal, secure just as many convictions, and have far — very far — fewer cases reversed.
Id. at 733-34, 31 So. at 420-21.
With great deference to the trial judge, we believe he, in effect, "painted himself into a corner" at the expense of a fair trial for appellant. The trial transcript reveals that it took the jury 18 minutes to reach a guilty verdict. Was this exceedingly quick decision reached because of the overwhelming evidence against appellant or was it because the jury had no alternative because they couldn't consider that appellant acted in self-defense? It appears the real reason will never be known. So, the paramount question remains: Did appellant receive a fair trial in light of the conflicting testimony regarding the chain of events on January 10, 1986?
We believe the better and fairer procedure would have been for the trial judge to instruct the jury on the elements of self-defense and then, as this Court in Lofton, supra, stated, "trust more to the common sense and sound judgment of the juries of this country."
We reverse appellant's conviction of aggravated assault solely on this issue and remand to the trial court for a new trial.
 ISSUE NO. 2 Whether the Trial Court Erred in Refusing Defendant's Instruction D-14, Which Would Have Authorized the Jury to Find the Defendant Guilty of the Crime of Simple Assault and Not Aggravated Assault.
Having already decided to reverse this case based on the erroneous granting of the "no self-defense" instruction, we simply comment that with regard to this lesser included offense issue, we find the case of Lee v. State, 469 So.2d 1225 (Miss. 1985), to be quite instructive and suggest to the trial judge he consider this at such time as this case is re-tried.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., PRATHER, ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
PITTMAN, J., not participating. *Page 99