¶ 1. Charlotte Sherron was convicted of being an accessory after the fact to her husband's crime of statutory rape by assisting the victim, who was her minor daughter, obtain an abortion. This assistance helped hide the husband's crime by removing its most obvious evidence.
 ¶ 2. Since the time of the passage of the parental consent statute for a minor's acquiring an abortion, no prior Mississippi appellate court decision has considered criminalizing in this way a parent's decision to consent to a minor child's abortion. Indeed, our search has not revealed a prosecution in any state on these grounds, though perhaps such prosecutions have occurred. We need not decide today the constitutionality of charging concealment of a rape due to the assistance a defendant gave her minor daughter to gain an abortion. Sherron raised the issue before trial only later to abandon it. Thus the issue was waived. We find no other error and affirm.
 FACTS ¶ 3. In January 1988, the defendant Charlotte Sherron, then known as Charlotte Howard, gave birth to a daughter whom we will in this opinion call "Jane." That alias is our best though limited means to avoid giving her undue publicity when we discuss her 2002 rape. Jane's mother and father were not married. Charlotte Sherron had a daughter with another man in about 1992, then had a third daughter in about 1996 with Xavier Sherron. When Xavier and Charlotte Sherron married is unclear, but it was before the 2001-2002 events that we next describe.
 ¶ 4. Xavier Sherron began having sexual intercourse with his stepdaughter Jane in December 2001 or January 2002. At the time that the intercourse began, Jane was still thirteen years old. After learning she was pregnant, Jane with the permission and assistance of her mother obtained an abortion in Tuscaloosa, Alabama. Only later did police learn that Xavier Sherron had intercourse with Jane. He was arrested, indicted, and convicted of statutory rape. He received a sentence of twenty-seven years without the possibility of parole. In August 2002, the defendant here, Charlotte Sherron, was indicted as an accessory after the fact to Xavier Sherron's crime of rape. The only event alleged in the indictment which constituted her crime was assisting her daughter obtain an abortion. Trial before a Lowndes County Circuit Court jury was not held until August 2004.
 ¶ 5. The first witness was the then sixteen year old victim, Jane. She said that after her mother went to sleep, Xavier Sherron would leave her mother's bedroom and go into Jane's room, where he would touch her sexually and then later began to have intercourse with her. Jane was frightened of him. She testified that Xavier Sherron told her not to tell her mother, the defendant. He told Jane that her mother would be upset with her if she discovered the sexual intercourse.
 ¶ 6. Jane testified that Xavier Sherron would come into her room as frequently as every other night. She did not testify as to the exact dates of the sexual abuse. However, the defendant, Charlotte Sherron, gave a statement to police on May 22, 2002, which was introduced into evidence. She said that approximately one year before the statement, Jane told her that Xavier Sherron had touched her inappropriately. *Page 33 
Charlotte Sherron asked her husband whether he was molesting Jane. Though he initially denied it, he finally admitted that he touched Jane but did not admit to intercourse. According to Charlotte Sherron's statement, Xavier Sherron promised that he would not do this again. She stated, "I gave him another chance, but I did not trust him." The sexual intercourse that made Jane pregnant occurred a few months later.
 ¶ 7. Jane testified that in February 2002, after she had turned fourteen, Xavier Sherron took her from school and asked whether she had experienced her monthly period. She had not. He then purchased a pregnancy test at a pharmacy. After arriving home, she complied with his demand that she take the test. It indicated that she was pregnant.
 ¶ 8. Xavier Sherron called his brother George Sherron, and also called Rosa and Greg Mostella, his wife's maternal aunt and uncle. He notified them that he had impregnated Jane. He then confessed his actions to Charlotte Sherron. Greg Mostella suggested that the situation be kept secret from Alice Howard, Charlotte Sherron's mother. Mostella stated that Ms. Howard would "kill" Xavier if she found out. According to Charlotte Sherron's statement, the Mostellas and George Sherron suggested that law enforcement authorities also not be told, because she would lose custody of her children and her husband would go to jail. Charlotte Sherron said that she let Xavier Sherron continue to live with her because she did not know how she was going to pay the bills if he went to prison.
 ¶ 9. Jane and her mother talked in a room by themselves about whether Jane wanted an abortion. Jane testified that she had no doubts about wanting to have an abortion. She did not want to give birth to and raise a child fathered by Xavier Sherron. Jane testified that this same night, after everyone went to sleep, her mother put her and the two younger daughters in the car, with the goal of driving to her grandmother Alice Howard's house. Xavier Sherron followed and tried "to run [them] off the road." Xavier Sherron pulled alongside his wife's vehicle, moved his van towards her car, but never hit her. Jane testified that "if we had kept on going, he would have actually ran us off the road." Both vehicles stopped. Xavier Sherron told his wife to return to their house, and she did. He said that no one would learn about the pregnancy. Charlotte Sherron stated that she had Jane lock her door at night for protection.
 ¶ 10. The defendant telephoned the Women's Clinic in Tuscaloosa, Alabama. The Clinic indicated that among the items needed to be scheduled for an abortion, Jane should have a picture identification card. Xavier Sherron took Jane to get the identification. On March 14, 2002, Xavier and Charlotte Sherron drove Jane to Tuscaloosa, Alabama, where the abortion was performed.
 ¶ 11. In May 2002, Jane visited with her uncle's fiancee and discussed what had happened in a "what-if-this-happened-to-you" manner. The fiancee concluded that Jane was discussing herself. Jane's uncle was told, and he told Charlotte Sherron's mother, Alice Howard.
 ¶ 12. Howard took Jane to the Columbus Police Department. Jane spoke with investigator Wayne McClemore. Lieutenant McClemore testified that he took Jane's statement, filed a report, and contacted the local Department of Human Services (DHS). DHS placed Jane in the care of her grandmother, Alice Howard, the person who upon learning of the crime had finally reported it. *Page 34 
 ¶ 13. The DHS investigation led to Xavier Sherron's admission to the statutory rape. McClemore and another investigator picked Sherron up, drove him to the police department, and obtained a statement from him. A statement was also taken from Charlotte Sherron which included this:
 I did call the Women's Clinic in Tuscaloosa, Alabama, and ask them about how far along in the pregnancy a person has to be to have an abortion. They said four to six weeks. They also said they needed a birth certificate, a Social Security card, and a picture ID. Xavier took [Jane] to the driver's license office in Columbus Tuesday, two days before [Jane] went to the doctor, to get her ID. Xavier and I took [Jane] to the Women's Clinic, and [Jane] got the abortion. 1 filled out the paperwork for [Jane] at the clinic. Xavier, Uncle Greg and I took [Jane] to her checkup in Tuscaloosa. I did not tell anyone about this because I have nobody to confide in. I was scared to tell the police because [I] did not know what would happen to me or my family. Uncle Greg, Rosa Mostella and George Sherron told me not to tell the police or my mom because I would lose my kids, and George did not want his brother going to jail. I let Xavier stay because I did not know how I was going to pay the bills. They thought my mom would kill Xavier if she found out about this. . . .
 ¶ 14. Charlotte Sherron did not testify at her trial. She was convicted and sentenced to three years' imprisonment, which would be followed by two years of post-release supervision.
 DISCUSSION ¶ 15. The defendant's briefs on this appeal have been prepared as a collaborative effort by her trial counsel working with students under the supervision of an attorney-professor at the University of Mississippi School of Law Criminal Appeals Clinic. The work was ably done, with detail and clarity. Charlotte Sherron's attorneys and near-attorneys would have us focus on defects in the proof of the elements of the offense of accessory after the fact to a felony. There is also an alleged instruction error which they urge should cause reversal. We will discuss those after addressing the constitutional issue that this prosecution raises, one that caused us to seek supplemental briefing.
Plain error as to infringement on abortion rights
 ¶ 16. This is a prosecution of a woman for assisting her daughter in acquiring an abortion. Those acts are said to have had the intent of aiding the defendant's husband in hiding the fact that he had raped and impregnated this minor child. As we will discuss, under Mississippi law, the minor could not have acquired an abortion without a court order unless a parent agreed. The question is thus raised of whether the prosecution interferes with the child's abortion rights recognized by the United States Supreme Court and which we must honor here.
 ¶ 17. The constitutional issue was not raised on appeal. However, the Court may "notice a plain error not identified or distinctly specified." M.R.A.P. 28(a)(3). As to evidentiary rulings, a plain error is one "affecting substantial rights" of a party. M.R.E. 103(d). More generally, an appellate court, "on occasion when circumstances warranted, has noted the existence of errors in trial proceedings affecting substantial rights of the defendants although they were not brought to the attention of the trial court or of this Court." Grubb v. State,584 So.2d 786, 789 (Miss. 1991).
 ¶ 18. Before examining more fully the specifics of the plain-error law, we turn to *Page 35 
the specifics of the possibly plain-error facts in this case. We start with an examination of the crime with which Sherron was charged. Someone who has "concealed, received, or relieved any felon, or having aided or assisted any felon, knowing that such person had committed a felony, with intent to enable such felon to escape or to avoid arrest, trial, conviction or punishment, after the commission of such felony," is an accessory after the fact. Miss. Code Ann. § 97-1-5
(Rev. 2006). The manner in which Charlotte Sherron was said to have violated this statute was set out in the indictment:
 Charlotte Sherron . . . on or about the 14th day of March, 2002, . . . did unlawfully, wilfully, and feloniously conceal, receive, aid or assist Xavier Sherron, knowing that the said Xavier Sherron had committed the crime of Statutory Rape, a felony, with the intent to enable the said Xavier Sherron to avoid arrest, trial, conviction or punishment after the commission of said crime, by taking [the daughter we have called "Jane"], the victim of the crime, to obtain an abortion with the intent to hide the fact [of the impregnation by Xavier Sherron.]
 ¶ 19. Our recitation of the facts has indicated many things that Charlotte Sherron did not do — she did not contact law enforcement authorities; she did not throw her husband out of the house; she did not send her daughter elsewhere to escape this man; and she did not in any other way initiate an accounting for his crimes. Yet as the State must have recognized when preparing the indictment, most of the elements of Charlotte Sherron's damning inaction are not crimes in Mississippi. The exception is failure to report child abuse. Miss. Code Ann. § 43-21-353 (Rev. 2004). The offense can be committed by physicians, school employees, and others who in the normal course of their occupations may encounter child abuse, but the crime also can be committed by "any other person" who becomes aware of the abuse. Id. Even if Charlotte Sherron could have been prosecuted for failing to report the abuse, the offense is a misdemeanor. Id.;Anthony v. State, 349 So.2d 1066, 1067 (Miss. 1977) (crime with maximum sentence of a year in county jail denotes a misdemeanor). The State may have wished for a more substantial penalty.
 ¶ 20. So in drawing up an indictment that Charlotte Sherron tried to conceal the rape committed by Xavier Sherron, the prosecution did not charge the inactions. The only action for which she was indicted was taking her daughter "to obtain an abortion. . . ." The indictment alleged that Charlotte Sherron's assistance with the abortion was given with the intent to hide her husband's crime. Though it was overwhelmingly proven that the mother failed to take any meaningful steps to protect the daughter from further abuse or to cause the husband's crimes to be detected, this conviction as an accessory to that crime depends on Sherron's consent to her daughter's abortion.
 ¶ 21. Mississippi law requires a parent to consent in order for a child to have an abortion or else the girl must file a petition in court. Miss. Code Ann. § 41-1-53 (Rev. 2005). Though the law in Alabama where the abortion was procured may be somewhat different, there has been no suggestion that the defendant's agreement was unnecessary. Minors have a constitutional right to abortion, but that right can be restricted in certain ways. Ayotte v. Planned Parenthood ofNorthern New England, 546 U.S. 320, ___ 126 S.Ct. 961, 966,163 L.Ed.2d 812 (2006). Mississippi's statutory parental consent provisions have been upheld as being consistent with federal constitutional principles. Pro-Choice *Page 36 Mississippi v. Fordice, 716 So.2d 645, 660 (Miss. 1998).
 ¶ 22. This conviction's interpretation of the crime of being an accessory after the fact could be seen as criminalizing the assistance a mother may legally give a daughter to abort a pregnancy, provided she gives that assistance with the intent of hiding a rape. A mother might determine that in order to avoid a criminal charge, she would not consent. The child would then need to file a petition in court on her own or with some other adult's assistance, to have the need for consent waived. Even if a court order were obtained, the mother could still be subject to prosecution if she assisted in that petition. The United States Supreme Court has ruled that state rules that impose an "undue burden" on a female's decision to abort a non-viable fetus are unconstitutional. Stenberg v. Carhart,530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (quotingPlanned Parenthood of Southeastern Pennsylvania v.Casey, 505 U.S. 833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674
(1992)). The court explained that "undue burden" is "shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id. The Mississippi Supreme Court adopted this standard and did not expand the right. Pro-Choice Mississippi716 So.2d at 655.
 ¶ 23. The evidence in the record fully supports that this defendant consistently failed her daughter in responding to the initial incidents of sexual abuse by Xavier Sherron and also in the response to the rape that led to pregnancy. If not for other members of the family, the crime may have remained undetected and, worst horror of all, the abuse may have continued. However, the sole acts for which Sherron was prosecuted were those connected with her giving the assistance that her daughter had to receive from one of her parents if she was to be permitted an abortion without a court order.
 ¶ 24. The question is whether prosecuting a parent for such activity unduly burdens the daughter's recognized constitutional right. Since this issue was not raised in the appeal, we return now to the law of plain error. In her supplemental brief, Sherron argues that she had pursued this issue in the trial court. To prove this, Sherron submitted an affidavit which asserted her attorney had brought on for hearing a demurrer to the indictment. The demurrer, which is in the record, stated that the indictment sought to criminalize actions which "would be in the exercise of her absolute constitutional right secured unto her by the Fourteenth Amendment to the United States Constitution, as determined by the United States Supreme Court in the case of Roe v. Wade."
 ¶ 25. No ruling on the demurrer appears in the record. The attorney's affidavit asserts that the demurrer was denied but no order was ever entered. Proper steps to supplement the record with this affidavit were not taken. M.R.A.P. 10(e). Even had that supplementation occurred, and should further review, perhaps on a remand, determine that a ruling had been obtained, we would still have the question of whether that issue may be brought before us at this time. As the United States Supreme Court has indicated regarding its nearly identical practices regarding whether to address unraised potential error, there must be error, it must be plain, and it must affect a substantial right. United States v. Olano,507 U.S. 725, 732-34, 113 S.Ct. 1770,123 L.Ed.2d 508 (1993).
 ¶ 26. As to the first question of whether there was error at all, the inquiry concerns, quite simplistically, whether the trial court made a reviewable error. More *Page 37 
must be shown than just that a defense right was not exercised. If a prosecutor in closing argument makes an assertion that might be interpreted to be a comment on the defendant's constitutional right not to testify, a defense counsel may decide for tactical reasons not to object or seek to convince the court of that error. There may be no trial because the accused waived the right to a trial and pled guilty. In both situations — failure to assert violation of a right and failure to assert a right — the trial judge committed no error by not insisting those rights be exercised. So we should examine whether the right asserted now, or from a different perspective, the error alleged in the trial court's ruling, was the subject of a conscious waiver. "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the `intentional relinquishment or abandonment of a known right.'" Id. at 733,113 S.Ct. 1770. Forfeiture is a failure to recognize and assert a right. Waiver is a failure to assert though the alleged right has been identified. A right that was waived is lost on appeal unless there is proof that the waiver was defective. A valid waiver means there was no error. A right that had been forfeited can be the subject of plain error assertions. Id.
 ¶ 27. The pretrial demurrer to the indictment reveals that Sherron's trial attorney sought a ruling on the right now asserted. The purported right was allegedly rejected by the court and then clearly abandoned by the defendant. In the post-trial motions, the issue was not asserted. In the briefing for the appeal, the issue was not raised. Therefore, even if the trial judge erred in overruling the demurrer, that possible error may have been waived. And we mean "waived" in distinction from "forfeited" as a conscious abandonment of the known right to assert this alleged trial error.
 ¶ 28. To determine if there has been waiver of this alleged constitutional right not to be prosecuted for assistance to a minor child's legal abortion, we must identify the requirements for a valid waiver. Constitutional rights certainly may be waived. Such rights are consciously waived every time a suspect makes a valid confession despite the Fifth Amendment right not to incriminate oneself, or consents to a search despite theFourth Amendment right to refuse consent. "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." Id. In support of the quoted observation, the United States Supreme Court cited a learned treatise on criminal law. The treatise authors concluded that determining which issues are proper to raise on appeal, and inferentially also at such procedural opportunities as in post-trial motions, is for the attorney:
 Counsel was free to follow the time tested advice of countless advocates that inclusion of "every colorable claim" will "dilute and weaken a good case and not save a bad one." It was for counsel to decide which claims were strong enough to be presented consistent with this strategy.
3 WAYNE R. LAFAVE, JEROLD H. ISRAEL, NANCY J. KING, CRIMINAL PROCEDURE, 11.6(a) (West 1999), at 596 (quoting Jones v.Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987
(1983)).
 ¶ 29. Generically, this abandoned issue was one presented to the trial court as a basis for dismissing all charges, was allegedly found by the trial court to be unavailing, and was then discarded at the trial *Page 38 
and appellate level by the defendant. Judgments have to be made by counsel as to the issues worth presenting. The implied judgment here by trial and appellate counsel was that there was insufficient merit, in light of other considered arguments, to continue pursuing a favorable ruling on the mother's alleged right to be free from prosecution for assisting in her minor child's receiving an abortion. Whether we would disagree with the decision or not does not affect the waiver. It does not matter what in hindsight appears to have been a good decision or a bad one. The attorneys had the right to make that decision, and it was procedurally made correctly and clearly. Even if an appellate court has the power to examine any issue, waiver ends the right to review.
 ¶ 30. In conclusion, for us to consider an issue of plain error, we should find that error caused a fundamental right of the defendant, Charlotte Sherron, to be denied. Randle v.State, 827 So.2d 705, 709 (Miss. 2002). What has been argued here by the State is that even though Mississippi has made parents integral to the assertion of the constitutional right to an abortion by a minor, the right belongs to the minor. Its exercise is shared but not its ownership. On the other hand, Sherron argues that even though the constitutional right is with the minor, a parent's fundamental right is to assist in a minor child's pursuit of an abortion. Prosecuting the parent would under this argument constitute an undue burden on the child's right. Regardless of such considerations, Sherron has validly waived the issue. Since waiver means the trial judge did not err in a manner subject to review, there is no need to resolve the extent of any implicated constitutional rights.
 ¶ 31. We now turn to the issues that were specifically raised in this appeal.
1. Weight and sufficiency of evidence.
 ¶ 32. In order to establish that Charlotte Sherron was an accessory after the fact to the statutory rape of Jane, the prosecution had to prove: (1) Xavier Sherron committed a completed felony; (2) Charlotte Sherron concealed, received, relieved, aided or assisted him when she knew he had committed a felony; and (3) Charlotte Sherron rendered such assistance or aid with the intent to enable Xavier Sherron to escape or avoid arrest, trial, conviction or punishment after he committed that felony. Miss. Code Ann. § 97-1-5; Mangum v. State,762 So.2d 337, 342-43 (Miss. 2000). Xavier Sherron's felony conviction and twenty-seven year sentence are not disputed. The issues here are the second and third elements of accessory after the fact.
 ¶ 33. Challenges on appeal to the sufficiency of evidence require a determination of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Bush v. State,895 So.2d 836, 843 (Miss. 2005). If the facts and inferences "point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty," we must reverse and render. Id. Conversely, if the evidence is such that under a reasonable doubt standard of proof, reasonable and impartial jurors could find guilt on each element of the offense, we will affirm. Id.
 ¶ 34. We now examine the elements of the offense. As noted above, the first element is conceded, which is that there must have been a completed felony committed by someone else.
 A. Conceal, Receive, Aid, or Assist *Page 39 
 ¶ 35. To prove the second element of accessory after the fact, the prosecution had to prove that Charlotte Sherron "concealed, received, relieved, aided or assisted" her husband and that she knew he had committed a felony. Miss. Code Ann. § 97-1-5. There are no statutory definitions for the words "conceal," "receive," "aid," or "assist." We therefore construe them according to their common meanings. Miss. Code Ann. § 1-3-65 (Rev. 2005).
 ¶ 36. The word "conceal" means "[t]o hide, secrete, or withhold from the knowledge of others." BLACK'S LAW DICTIONARY (6th ed. 1990). "Aid" means "[t]o support, help, assist or strengthen." Id. "Assist" means "[t]o contribute effort in the complete accomplishment of an ultimate purpose intended to be effected by those engaged." Id. Finally, "receive" means "[t]o take into possession and control; accept custody of; collect." Id. These commonly understood words support that a defendant is guilty when she acts to prevent discovery and prosecution of a felony.
 ¶ 37. The evidence supported that Sherron "concealed, received, relieved, aided or assisted" her husband when she took Jane to Tuscaloosa for an abortion. The prosecution alleged that Charlotte Sherron committed these acts with the intent to conceal the fact that Xavier Sherron committed statutory rape. Sherron alleges that those acts were not personal assistance to the husband but to the child. She only "wanted to respect her daughter's wishes and wanted to free her daughter of the burden of raising her stepfather's child." We find these arguments actually involve the issue of intent. The acts themselves suffice under the statutory language. We now turn to intent.
B. Intent
 ¶ 38. The State had to prove that Sherron intended to enable her husband "to escape or avoid arrest, trial, conviction or punishment" after he committed statutory rape. Miss. Code Ann. § 97-1-5. Whether an accused had a specific intent is a question of fact for the jury. Duplantis v. State,708 So.2d 1327, 1341 (Miss. 1998). The jury makes its determination based on the facts shown in each case. Id. "Unless one expresses [her] intent, the only method by which intent may be proven is by showing the acts of the person involved at the time in question, and by showing the circumstances surrounding the incident." Id. at 1342.
 ¶ 39. Sherron argues there is not sufficient evidence that she intended to shield her husband from punishment for statutory rape and her intent was solely to help her daughter. According to the State, a reasonable juror could conclude that regardless of what else she had in mind, Sherron also intended to hide her husband's awful offense. Among the circumstances relevant that the jury had to consider as to intent were these: (a) Sherron did not report her husband's crime; (b) Sherron helped her daughter end a pregnancy caused by statutory rape; and (c) Sherron continued to allow her husband to live with her and her children because they relied on his income.
 ¶ 40. In support of her mother, Jane indicated that Charlotte Sherron was afraid of Xavier Sherron. Jane testified that he was violent with her mother and that she once saw him choke her. Jane also testified that Xavier Sherron once threw a pot of grease against the wall during an argument with her mother. Xavier Sherron also pushed the defendant onto a couch and bit her breasts. Jane testified that, on occasion, he slammed flower pots on the floor and threw figurines at her mother. Jane's grandmother, Ms. Howard, supported in her testimony that the defendant was afraid of her husband. *Page 40 
 ¶ 41. In the defense view, the intent for the assistance on the abortion was one to aid the minor child. It is further argued that failure to report the statutory rape was solely a function of Xavier Sherron's intimidating nature. However, the defendant admitted to other considerations. Sherron stated, "Uncle Greg, Rosa Mostella and George Sherron told [her] not to tell the police or [Ms. Howard] because [she] would lose [her] kids, and George did not want his brother going to jail." Sherron also explained that she allowed her husband to continue to live with her because she needed his monthly disability check. She also said that she did not report the crime because she did not know how she would pay her bills.
 ¶ 42. This evidence constitutes circumstantial proof that one of Sherron's intents was to keep the crime of rape from being exposed. In addition, she likely had an intent to keep her young daughter from giving birth to a child who was fathered by rape. Quite simply and logically, the defendant could have operated with mixed purposes when she assisted in her daughter's abortion.
 ¶ 43. This abortion was received in Alabama. For purposes of evaluating the legal effect of the assistance in obtaining an abortion, we nonetheless look to Mississippi law since our legislature, in criminalizing conduct such as being an accessory after-the-fact, must take into account the rights granted under other Mississippi statutes. A minor who has become pregnant due to sexual intercourse with a step-father has the right to an abortion if her mother alone consents. Miss. Code Ann. § 41-41-53(2)(c). Absent the parental consent, a court would have had to consider whether to permit the abortion. Miss. Code Ann. § 41-41-53(3). The rape victim in this case testified that she never had any doubt that she wanted an abortion. The defendant also testified that she did not wish for her daughter to bear a child fathered by rape. There is no argument that there was anything illegal under Mississippi law in Jane's having this abortion.
 ¶ 44. This mother's assistance on the abortion could well be found to have had two intents behind it, one to support her daughter and the other to support her husband in preventing his crime from being exposed. When an act is done with multiple intents, it may be criminalized if one of the intents is an element of the relevant offense. In a prosecution for a conspiracy illegally to influence a federal election, the defendant alleged that he was more concerned about affecting some of the contests simultaneously being decided for local office:
 In our view, petitioners err in seeking to attach significance to the fact that the primary motive behind their conspiracy was to affect the result in the local rather than the federal election. A single conspiracy may have several purposes, but if one of them — whether primary or secondary — be the violation of a federal law, the conspiracy is unlawful under federal law.
Anderson v. United States, 417 U.S. 211, 225-26,94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).
 ¶ 45. Some precedents hold that conviction may result even though the relevant criminal intent is a secondary one, but the criminal intent cannot be dwarfed by a legal one. UnitedStates v. Woodward, 149 F.3d 46, 71 (1st Cir. 1998), certden. 525 U.S. 1138, 119 S.Ct. 1026, 143 L.Ed.2d 37. With a different emphasis, another court stated that the illegal intent must have been "one of the [scheme's] several dominant
purposes. . . ." United States v. Ellis, 935 F.2d 385
(1st Cir. 1991) (emphasis added). *Page 41 
 ¶ 46. Summarizing some of this case law, one treatise-writer labeled the issue as one of "multiple intents," and concluded that "so long as the defendant has the intention required by the definition of the crime, it is immaterial that he may also have had some other intention." WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.2(d) (West 2006).
 ¶ 47. We conclude that the existence of a legal intent sufficient to cause the defendant to commit the act being prosecuted is not a defense if the criminal intent was also present in more than a de minimis way. The existence of the improper intent will be a jury issue, determined largely by circumstantial evidence and guided by proper jury instructions. Since the jury certainly could find on this evidence that the defendant intended to hide her husband's crime no matter what else she intended to do, there was sufficient evidence of a criminal intent.
 ¶ 48. We find no error in the jury's evaluation of the conflicting evidence of intent and decision that Sherron acted to conceal Xavier Sherron's crime when she took Jane to get an abortion.
2. Refusal of jury instruction
 ¶ 49. This defense instruction (D-3) was denied at trial: "The Court instructs the jury that the law does not require the defendant to report the crime committed against her daughter." Sherron claimed that the instruction was the heart of her defense theory. The instruction was refused on the basis that it amounted to a comment on the evidence.
 ¶ 50. A defendant is entitled to submit instructions that present her theory of the case. Henry v. State,816 So.2d 443, 447 (Miss.Ct.App. 2002). An instruction should not single out certain parts of the evidence to the point that it amounts to a comment on the evidence. Manuel v. State,667 So.2d 590, 592 (Miss. 1995). "[W]here there is serious doubt as to whether a requested instruction should be given, doubt should ordinarily be resolved in favor of the accused."Lenard v. State, 552 So.2d 93, 96 (Miss. 1989). We will not reverse based on the denial of an instruction if "the jury has been properly, fully, and fairly instructed by other instructions." Henry, 816 So.2d at 447.
 ¶ 51. Whether D-3 amounted to a comment on the evidence depends on the evidence. The prosecution alleged that, by taking Jane to have an abortion, Sherron acted to conceal her husband's statutory rape. If the trial judge had instructed the jury that it is not illegal to neglect to report the fact that a husband committed statutory rape against his daughter, the jury could have taken that instruction to mean that it is, likewise, not illegal to conceal the rape. The instruction would have tended to cause jurors to believe that the substance of the prosecution's allegation was a legal act. The question here is whether the instruction would tend in its emphasis to mislead the jurors on the actual legal questions before them. It was reasonable to conclude that it would.
 ¶ 52. Additionally, and more importantly, the instruction was legally in error. There are obligations to report sexual abuse of children. Sherron admitted that she "was first told by my daughter [Jane] about a year ago while I was at work at New Hope school that my husband Xavier Sherron had touch[ed] her on her breast and vagina area." Sherron's work for the New Hope school placed her under this obligation: "Any . . . public or private school employee or any other person . . . having reasonable cause to suspect that a child is . . . an abused child, shall cause an oral report to be made immediately by telephone or otherwise and followed as soon thereafter as possible by a *Page 42 
report in writing to the Department of Human Services. . . ." Miss. Code Ann. § 43-21-353(1) (Rev. 2004). An "abused child" is "a child whose parent, guardian or custodian or any person responsible for his care or support . . . has caused . . . upon said child sexual abuse." Miss. Code Ann. § 43-21-105(m) (Rev. 2004). Violations of those reporting obligations is punishable by a fine and by imprisonment of up to one year. Miss. Code Ann. § 43-21-353(7) (Rev. 2004). Though a citizen does not always have a duty to report a crime, that was not the case here.
 ¶ 53. Denial of this instruction was proper.
 ¶ 54. As we find no reversible error on the issues raised and no plain error as to any other issue, we affirm Charlotte Sherron's conviction and sentence.
 ¶ 55. THE JUDGMENT OF THE LOWNDES COUNTY CIRCUIT COURTOF CONVICTION OF ACCESSORY AFTER THE FACT TO STATUTORY RAPE ANDSENTENCE OF THREE YEARS IN THE CUSTODY OF THE MISSISSIPPIDEPARTMENT OF CORRECTIONS AND TWO YEARS OF POST-RELEASESUPERVISION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSEDTO LOWNDES COUNTY.
LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. ROBERTS, J., CONCURS IN PART AND RESULT AND SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY LEE AND MYERS, P.JJ., AND GRIFFIS, J. KING C.J., NOT PARTICIPATING.