# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00660-COA

**JUSTUS BARFIELD** APPELLANT

**v.**

**STATE OF MISSISSIPPI** APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/13/2021 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES A. WILLIAMS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISTRICT ATTORNEY: | STEVEN S. KILGORE |
| DISPOSITION: | AFFIRMED - 12/13/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     Justus Barfield was found guilty of accessory after the fact to murder by a jury in the Neshoba County Circuit Court. He was sentenced to a term of twenty years in the custody of the Mississippi Department of Corrections, with ten years to serve and the last ten years suspended, followed by five years of supervised probation. Following the denial of his post-trial motion for judgment notwithstanding the verdict or, in the alternative, a new trial, Barfield filed a notice of appeal of his conviction and sentence.

## FACTS

¶2.     On October 20, 2019, Tyrone Broxton got a call from James Kelly who indicated that he needed Broxton's help. As a result, Broxton went to the Sandhill community to Kelly's

mother's old trailer. When he arrived, Kelly told Broxton that a couple of months earlier, his house was robbed by DeMarquis Houston and three other men. Kelly said that the robbers had held his children and their mother "at gunpoint." Kelly had arranged for Joanna Brook Gilmer to bring Houston to the trailer that night, so Kelly and Broxton went to the laundry room in the back of the trailer to wait for them to arrive.

¶3.    Sometime after 10 p.m. that night, according to Gilmer, she picked up Houston at the Pendleton Square Apartments. They were supposedly going to Kelly's trailer to get high. Kelly was supposed to meet them there and bring them some weed. When they arrived at the trailer, it did not appear that anyone else was there, so they went into the trailer to wait. Gilmer messaged Kelly who indicated that he was on the way. Gilmer and Houston watched television, and they started having sex. At that point, Broxton and Kelly came out from the back of the trailer where they had been hiding. Kelly pointed a gun at Houston and told him to stay on the couch and not to scream, or he would kill him. While Gilmer was getting dressed, Kelly zip-tied Houston's hands and feet. After Gilmer left, Kelly questioned Houston about the robbery, and Houston identified the others involved. Broxton stepped outside to smoke, and Kelly followed a few minutes later after he put tape over Houston's mouth. When Broxton asked Kelly what he was going to do, Kelly said that Houston was going to be here for a couple of days, but he also said he was going to kill him. While they were outside talking, they heard a commotion inside the trailer. When they went inside, they saw Houston "seizing up, rolling around like he was having a seizure." Broxton said Houston was still naked, zip-tied, and had duct tape on his mouth. When it was clear that Houston was

2

dead, Kelly asked Broxton if he knew where to put a body. Kelly asked Broxton for help putting the body in a freezer. When they could not find a rachet strap to secure the freezer, Kelly told Broxton he could leave. Broxton testified that he had no further connection to the disposition of Houston's body after he left the trailer.

¶4.     Ian Caleb Thompson testified that in October 2019, he was living on his family's land with his ex-girlfriend and was working in his family's farming business. At that time, Barfield was unemployed and living with them. Thompson had gone to high school with Kelly, and they continued to visit one another frequently. Thompson testified that Kelly and Barfield were close friends and that Kelly would often visit at Thompson's house. When Thompson went home for lunch on October 21, 2019, Kelly was at his house visiting with Barfield.  Thompson joined them, and Kelly told them what happened with Houston and about having Houston's body in a freezer. He described how he had tied Houston up and that he had thrashed around and died. Kelly told them that he needed to get rid of the body and that he had a friend in Louisville that had a place he could hide it.  After Kelly left, Thompson and Barfield talked about what a "crazy situation" Kelly had described.

¶5.     Thompson testified that later that evening, between 8 and 9 p.m., Kelly came back to the house with Houston's body in the freezer in the back of his truck. Kelly wanted to hide the body in Thompson's pond, which was across the road from his house. According to Thompson, Kelly asked them for their assistance. They talked for about ten to fifteen minutes and developed a plan to put the body in the pond. Thompson said, "[W]e can do this," and went and got his forklift (loader). Kelly and Barfield waited for Thompson to come back.

3

Thompson pulled the forklift up to the truck, and he and Kelly slid the freezer over onto the forks. Thompson drove the forklift across the road to the pond, and Kelly and Barfield followed along close beside the forklift. When they got to the edge of the pond, Thompson put the pallet down; he and Kelly pushed the freezer into the pond, but it floated. When they realized that it was not going to sink, Barfield stood on the bank of the pond and watched while Thompson and Kelly struggled to get the freezer back on the bank.

¶6.     Once the freezer was back on the bank, Thompson testified that the three men discussed what to do next. Thompson and Barfield told Kelly they were not going to touch the body. After Thompson carried the forklift back to his shop, he got in his Jeep and went back to the pond to pick up Kelly and Barfield.  They all went to Thompson's shop, and Thompson told Kelly to "get whatever you need." Kelly got a tarp, a strap, and other materials. The three men then went back to the pond and dropped Kelly off so that he could submerge the body. Thompson and Barfield went home. Kelly showed up at their house about 3 a.m. and took a shower but left without talking to anyone.

¶7.     Thompson testified that he did not go back to the pond the next day. He stated that because he worked in the area, he would look at the pond from a distance.  He knew that Barfield also checked the pond from time to time because they would have conversations about it. Barfield, at some point, told Thompson that he saw something "protruding from the water."  Barfield and Thompson went to the pond together and observed what they believed to be a body part. Thompson then contacted Kelly and told him that he needed to come do something because it was obvious there was something out there in the pond.

¶8.     Thompson further testified that Kelly did not offer him or Barfield anything for their help. He confirmed that the pond is in Neshoba County. On cross-examination, in response to leading questions, Thompson testified that Barfield did not drive the forklift, did not touch the freezer, did not drive any vehicle, did not pick the pond as the location to put the body, did not assist in putting the freezer in the pond, did not choose the tarp or straps, and did not call Kelly and tell him to come back after they saw a body part. Thompson said that Barfield did nothing himself, physically, to put the body in the pond.

¶9.     On re-direct examination, Thompson confirmed that Barfield was the first person Kelly talked to about the need to get rid of the body. Thompson reaffirmed that they were all together throughout the period he testified about on direct examination. He confirmed that he and Barfield checked the pond in the days and weeks after the incident. He again stated that it was Barfield who first saw Houston's body floating in the pond.

¶10.    Investigator Derek Wyatt of the Neshoba County Sheriff's Department was assigned to the case of Houston's disappearance. Suspects were developed through Crime Stoppers and letters received by law enforcement. Kelly and Broxton were the primary persons of interest. Wyatt discovered that Kelly was wearing a court-ordered GPS monitoring device during the period of Houston's disappearance. A search warrant was served upon the monitoring company, and law enforcement obtained timed-location information for Kelly during the relevant time period based upon witness interviews. This led the investigation to Kelly's trailer where Wyatt found all the flooring had been ripped out and placed in a burn pit. Some tips had said that Houston's body was in a pond or a lake. Also from the GPS

5

information, several ponds were identified in the general area of Kelly's trailer. Wyatt testified that the information placed Kelly at "[Thompson's] residence, all around the chicken houses, all around the shop, and the GPS actually put his monitor out in the water in the pond." Wyatt testified that the information shows Kelly was in this area from about 9:30 p.m. to almost 2:30 a.m. on October 21-22, 2019.

¶11. Neshoba County Sheriff Eric Clark testified that when he took office in January 2020, he assumed the responsibility for the ongoing investigation into Houston's disappearance. Based upon information obtained during Wyatt's investigation, Sheriff Clark testified that a search warrant was obtained for a pond on Thompson's property in February 2020. Law enforcement used two six-inch pumps and started removing the water from the pond. Houston's body was found wrapped in a tarp and attached to a feed trough. The body and the trough had been submerged by the use of forty-five-pound dumbbell weights, cinder blocks, and other things used to weigh it down.

¶12. At the time of Barfield's trial, Kelly was awaiting trial on a charge of capital murder. Gilmer and Broxton had already pled guilty to manslaughter, and Thompson had pled guilty to accessory after the fact of murder. Barfield was tried, and the jury found him guilty of accessory after the fact to murder. He appealed his conviction and raised eight assignments of error, which we address separately below.

**ANALYSIS**

I. **Was the evidence legally sufficient to prove Barfield guilty as an accessory after the fact to murder?**

¶13. Barfield contends that the evidence at trial showed that Barfield was merely present

6

during the events described above. He contends that there was no evidence that he planned or participated with the others in placing Houston's body in the freezer and into the pond. He contends that the proof showed only that he was physically present while others discussed what to do and then placed Houston's body in the pond. Therefore, Barfield contends, the evidence was legally insufficient to support the conviction.

¶14. In *Buchanan v. State*, 316 So. 3d 619, 630 (¶49) (Miss. 2021), the supreme court described the standard of review of this issue as follows:

> This Court reviews de novo a trial court's ruling on the legal sufficiency of the evidence." *Haynes v. State*, 250 So. 3d 1241, 1244 [(¶6)] (Miss. 2018) (citing *Brooks v. State*, 203 So. 3d 1134, 1137 [(¶11)] (Miss. 2016)). "**When reviewing a case for sufficiency of the evidence, 'all credible evidence that is consistent with guilt must be accepted as true, and the State is given the benefit of all favorable inferences that may be reasonably drawn from the evidence**.'" *Id*. (alterations in original) (internal quotation marks omitted) (quoting *Burrows v. State*, 961 So. 2d 701, 705 [(¶9)] (Miss. 2007)). "We examine the evidence in the light most favorable to the State, while keeping in mind the beyond-a-reasonable-doubt burden of proof standard." *Id*. (citing *Dees v. State*, 126 So. 3d 21, 26 (Miss. 2013)). This burden must be satisfied with evidence, not speculation or conjecture. *Edwards v. State*, 469 So. 2d 68, 69-70 (Miss. 1985); *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974). "Should the facts and inferences . . . 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,' the proper remedy is for the appellate court to reverse and render." *Haynes*, 250 So. 3d at 1244 (internal quotation marks omitted) (quoting *Brown v. State*, 965 So. 2d 1023, 1030 (Miss. 2007)).

(Emphasis added).

¶15. As stated above, we must consider as true all evidence consistent with Barfield's guilt, and the State must be given the benefit of all reasonable inferences that can be drawn from the evidence. Considering Thompson's testimony in the light most favorable to the verdict,

Barfield knew that Kelly had murdered Houston and that he had put Houston's body in a freezer. When Kelly showed up at the residence of Thompson and Barfield with Houston's body in a freezer on the back of his truck, they were all involved in a discussion about what to do with the body. While it may not have been Barfield's idea to put the body in the pond, he deliberately associated himself with the crime by walking with Barfield and Kelly, every step of the way, as the body was carried to and placed in the pond. Thompson testified that when they left the house area with the body on the forklift, they all knew they were going to put the body in the pond and all three were participating in the process. When the freezer did not sink, all three were involved in a discussion about what to do next. Although Thompson and Barfield would not touch the body, they were with Kelly as he gathered the items he needed to submerge the body in the pond. Thompson and Barfield were together when they carried Kelly back to the pond and dropped him off so he could conceal the body. Thereafter, Thompson and Barfield watched the pond to see if the body floated up. When Barfield saw a body part sticking out of the water, he told Thompson, who called Kelly to come fix the situation. When questioned by law enforcement, Barfield concealed what he knew about the hidden body.

¶16.    The dissent agrees with Barfield that the evidence was legally insufficient to support his conviction for accessory after the fact to murder. The dissent posits that "one may be convicted of a felony from minimal action, but not from a complete lack of action." The dissent argues that the evidence in this case proves only that Barfield was present when Houston's body was hidden in the pond. We disagree.

8

¶17. The State's theory of the case was that Barfield was guilty of "aiding and abetting" Thompson and Kelly in concealing Houston's body to assist Kelly in avoiding arrest and prosecution for the murder of Houston. In *Pointer v. State*, 202 So. 3d 210, 214 (¶12) (Miss. Ct. App. 2016), this Court explained:

> To be convicted as an accessory before the fact—i.e., as an aider and abettor—a person must have done something to "incite, encourage, or assist the actual perpetrator in the commission of the crime." *Vaughn v. State*, 712 So. 2d 721, 724 (¶11) (Miss. 1998) (quoting *Malone v. State*, 486 So. 2d 360, 363 (Miss.1986)). **This can be done through "acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or *even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition.*"** *McDowell v. State*, 984 So. 2d 1003, 1011 (¶21) (Miss. Ct. App. 2007) (quoting *Swinford v. State*, 653 So. 2d 912, 915 (Miss.1995)). However, "the mere presence of a person is not sufficient even though such person might have approved of the crime." *Id.* (quoting *Griffin v. State*, 293 So. 2d 810, 812 (Miss.1974)).

(Emphasis added). As noted above, the evidence shows that Barfield was included in all the conversations, over several hours, leading up to the effort to conceal Houston's body in the pond. He was present with Thompson and Kelly at several locations as they worked toward concealing the body. While Barfield may not have touched the body and may not have gotten into the pond, the jury could reasonably infer that he did not stand mute during all the conversations and activities. He kept himself in a position to help in other ways should he have been called upon. Barfield's intent to assist can be inferred by his continued presence throughout the effort to conceal the body, rather than staying at the house when the body was being carried to the pond.

¶18. After the body was placed in the pond, it was Barfield who alerted Thompson that

a portion of the body could be seen in the pond. This allowed Thompson to call Kelly, who apparently was able to re-submerge the body. Additionally, when law enforcement questioned him after the body was discovered, Barfield failed to disclose what he knew about how the body came to be in the pond. The jury could infer that, by his silence, Barfield was protecting himself, as well as Kelly. In *Gray v. State*, 328 So. 3d 194, 198 (¶12) (Miss. Ct. App. 2021), we acknowledged:

> We note that a jury may also infer participation based on one's presence, companionship, and conduct before and after the offense. *Hubbard v. State*, 187 So. 2d 885, 886 (Miss. 1966).

If we accept, as we must, that all credible evidence consistent with Barfield's guilt is true, and "the State is given the benefit of all favorable inferences that may be reasonably drawn from the evidence," we find that the evidence is legally sufficient for a jury to find Barfield guilty beyond a reasonable doubt.

## II. Did the trial court commit plain error by giving an erroneous "aiding and abetting" instruction?

¶19. Barfield argues that it was plain error for the trial judge not to instruct the jury that it must first find beyond a reasonable doubt that Barfield "had entered into a common scheme, design and joint enterprise to assist in the concealment of Houston's body." Barfield argues on appeal that before the jury could "utilize" Jury Instruction S-3, they should have been required to find that there was a plan. He argues that the jury was not instructed that they must first find that he and Thompson "formed a common design to aid and assist Kelly by concealing Houston's body in the pond." He argues again, as he did in the first issue that there was no proof that he did anything.

10

¶20. Instruction S-3 was given by the trial judge without objection by Barfield. In fact, Barfield's trial counsel specifically stated that he had no objection to the instruction. On appeal, recognizing that no contemporaneous objection was made at trial, Barfield asks this Court to consider this issue under a plain error analysis. Concerning the plain error doctrine, this Court stated in *Blocton v. State*, 340 So. 3d 384, 393 (¶33) (Miss. Ct. App. 2022):

> Although no objection was made to Investigator Meyers' testimony at trial, we may still review the circuit court's decision under the plain-error doctrine. *See Mitchell v. State*, 788 So. 2d 853, 855 (¶8) (Miss. Ct. App. 2001). "Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant . . . and which affects a defendant's 'fundamental, substantive right.'" *Conners v. State*, 92 So. 3d 676, 682 (¶15) (Miss. 2012) (quoting *Smith v. State*, 986 So. 2d 290, 294 (¶10) (Miss. 2008)). "For the plain-error [rule] to apply, there must have been an error that resulted in a manifest miscarriage of justice or "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id*. (quoting *Brown v. State*, 995 So. 2d 698, 703 (¶21) (Miss. 2008)).

¶21. Instruction S-3 read as follows:

> The Court instructs the Jury that the guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that ordinarily, anything a person can do for himself or herself may also be accomplished by that person through the direction of another person as his or her agent, by acting in concert with, or under the direction of, another person or persons in joint effort or enterprise.

> If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.

> Before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself or herself in some way with the crime and participate in it with the intent to bring about the crime.

11

Of course, mere presence at the scene of the crime and knowledge that the crime is being committed are not sufficient to establish that the defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law.

This identical instruction was adopted by Mississippi Supreme Court for use in aiding and abetting cases. *See Milano v. State*, 790 So. 2d 179, 185 (¶¶21-22) (Miss. 2001).

¶22.     Barfield and Thompson were jointly indicted in this matter as accessories after the fact to murder. The indictment alleges that Barfield and Thompson assisted Kelly to avoid arrest and conceal evidence at a time when they knew Kelly had committed murder. The indictment further alleges that they did this by assisting Kelly in "concealing and disposing of the deceased body of Demarquis Houston." The proof shows that Barfield, Thompson and Kelly were all together for a significant period of time on the evening in question. There was testimony of discussions between the three men concerning the disposition of Houston's body as well as testimony that all three were together when Houston's body was carried from Kelly's truck and was first placed in the pond. When the freezer would not stay submerged, all three were together when Kelly obtained the material he ultimately used to conceal the body in the pond. There is also testimony that when Barfield saw a body part above the water that he told Thompson, who then called Kelly to fix the situation. While no one person took all the acts necessary to conceal the body and keep it concealed, the law provides that all who knowingly participated in the endeavor of concealing the body are criminally liable. While

12

certainly there was conflicting testimony over the extent of Barfield's involvement, that was an issue for the jury to resolve. However, the trial judge committed no error in giving Jury Instruction S-3.

**III.    Did the trial judge err by failing to properly instruct the jury concerning accomplice testimony?**

¶23.    Barfield argues that this Court should find that the trial court committed plain error by its instruction concerning accomplice testimony. Barfield contends that the jury should have been instructed that only the "uncorroborated" portions of Thompson's testimony be viewed with great caution and suspicion. Instead, the instruction given by the trial court required the jury to view *all* of Thompson's testimony in that manner. Because Barfield's testimony corroborated favorable portions of Thompson's testimony, he argues that the trial court erred by instructing the jury to view *all* of Thompson's testimony in the same manner.

¶24.    This issue was resolved by the Mississippi Supreme Court in *Jones v. State*, 203 So. 3d 600, 612 (¶36) (Miss. 2016):

> We hold that the trial court erred in instructing the jury that, in order to disregard the accomplice's testimony, first it had to find the testimony to be uncorroborated and, second that it had to find the accomplice testimony to be unreasonable, self-contradictory, or substantially impeached. **We clarify that those standards are legal determinations for the trial court to make** in determining, first, whether to grant the cautionary accomplice instruction and, second, whether to grant or deny a motion for a directed verdict and/or a motion for a judgment notwithstanding the verdict.

(Emphasis added). The court then went further and mandated the form of instruction to be given when the trial court finds critical portions of an accomplice's testimony to be uncorroborated:

13

The standards having been clarified, we approve the use of the following accomplice jury instruction:

> During the course of his testimony in this trial, the witness John Doe claimed to have participated with the defendant in [the crime for which the defendant is on trial]. Doe is an admitted accomplice, and, as such, the jury should consider his testimony with great caution and suspicion. The jury is the sole judge of the credibility and the believability of all the witnesses, and it is for the jury to decide how much weight and worth, if any, to give the testimony of the witnesses, including Doe. As you consider Doe's testimony, you may accept such portions, if any, that you deem credible, and reject such portions, if any, that you do not deem worthy of belief.

> **The above instruction is to be given in future cases upon the trial court's determination that the accomplice's testimony was uncorroborated**. *See Williams* [*v. State*], 32 So. 3d [486,] 491 [(Miss. 2010)].

*Jones*, 203 So. 3d at 612 (¶35) (emphasis added).

¶25.    In the present case, the defense requested an accomplice instruction, which the trial court refused because the instruction did not comply with the instruction in *Jones*. The trial judge asked both sides for authority that addressed the situation where part of the accomplice testimony is corroborated and part is not. Neither side produced a case exactly on point. In any event, the trial court found that "the part that is uncorroborated is really the heart of the case." Having made the "legal determination" that was required, the trial judge advised the defense that if Barfield would submit an instruction that conforms with *Jones*, it would be given. The defense complied and the trial court gave Jury Instruction D-8A, which is identical to the instruction that the supreme court mandated in *Jones*. The trial court did not err by giving this instruction.

**IV.    Did the trial court err by its refusal to instruct the jury that**

14

**Barfield had no duty to reveal to the police that he knew where
Houston's body was concealed?**

¶26.　Barfield contends that the trial court erred by refusing the proposed defense instructions D-10 and D-11. These instructions, Barfield contends, were necessary to show that he had no duty to report that Kelly and Thompson hid a dead body in the pond. There was an extensive discussion of these instructions in chambers. The trial judge pointed out that Barfield, charged with being an accessory after the fact of murder, was alleged to have "assisted James Walter Kelly to avoid arrest and conceal evidence." The judge discussed that "conceal may mean hide it under this table or in a pond, but it also means not to tell, keep it secret." The trial judge acknowledged that if you simply see a crime committed and do not call the police, you have not committed a crime. The State argued that that concept was covered in other instructions. Barfield's counsel agreed that while one of the State's instructions informed the jury that "mere presence alone is not a crime," it was still important for the jury to know that Barfield had no duty to report it to law enforcement. The trial court ruled that the relevant issue was adequately covered by other instructions.

¶27.　Barfield cites *Hye v. State*, 162 So. 3d 750, 759-60 (¶28) (Miss. 2015), for the proposition that the failure to report a crime is not a criminal offense because "Mississippi does not recognize misprision of felonies." However, he does not cite a case where such an instruction has been given, especially in an accessory-after-the-fact case.

¶28.　In *Sherron v. State*, 959 So. 2d 30 (Miss. Ct. App. 2006), this Court dealt with a similar issue. In that case, the defendant, the victim's mother, was charged as an accessory after the fact to her then-husband's statutory rape of his stepdaughter. *Id.* at 32 (¶1). After the

15

victim learned that she was pregnant, she obtained an abortion with the permission and assistance of her mother. *Id.* The minor child's mother and the stepfather drove her to have the abortion. *Id.* at 33 (¶10). Two months later, other relatives took the victim to the police to report the offense. *Id.* at (¶12).

¶29.    The mother was charged as an accessory after the fact because it was alleged that she concealed her husband's crime when she took her child out of state to have an abortion. *Id.* at 39 (¶37). The State had to prove that the mother did this with the intent to enable her husband "to escape or avoid arrest, trial, conviction or punishment" after he committed statutory rape. *Id.* at (¶38). She argued that she did this in support of her minor daughter and that she had no duty to make a report to law enforcement. She requested a jury instruction to inform the jury that she had no duty to report the crime committed against her daughter. *Id.* at 41 (¶49). The instruction was denied by the trial court.  *Id.* In considering this issue on appeal, this Court held:

> If the trial judge had instructed the jury that it is not illegal to neglect to report the fact that a husband committed statutory rape against his daughter, the jury could have taken that instruction to mean that it is, likewise, not illegal to conceal the rape. The instruction would have tended to cause jurors to believe that the substance of the prosecution's allegation was a legal act. The question here is whether the instruction would tend in its emphasis to mislead the jurors on the actual legal questions before them. It was reasonable to conclude that it would.

*Id.* at (¶51).[1]

¶30.    The trial judge was also concerned that the instruction could be confusing to the jury.

---

[1] This Court noted that "[a]dditionally, and more importantly," there are statutory obligations to report child sexual abuse. *Id.* at (¶52). There was no statutory-reporting requirement identified to be applicable in the present case.

He also believed the point was covered by other instructions. Again, Jury Instruction S-3 informed the jury, in part, as follows:

> Of course, **mere presence at the scene of the crime and knowledge that the crime is being committed are not sufficient** to establish that the defendant either directed or aided and abetted the crime **unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator**.

(Emphasis added). In *Pulliam v. State*, 321 So. 3d 1185, 1193 (¶27) (Miss. Ct. App. 2020), this Court stated:

> We review the decision to give or refuse a jury instruction for abuse of discretion. *Newell* [*v. State*], 49 So. 3d [66,] 73 (¶20) [(Miss. 2010)]. "The jury instructions are to be read as a whole, with no one instruction to be read alone or taken out of context." *Blanden v. State*, 276 So. 3d 1204, 1210 (¶21) (Miss. Ct. App. 2018) (quoting *Watkins v. State*, 101 So. 3d 628, 633 (¶16) (Miss. 2012)). "No reversible error exists if the instructions fairly, though not perfectly, announce the law of the case and create no injustice." *Ambrose v. State*, 254 So. 3d 77, 146 (¶236) (Miss. 2018) (quoting *Ronk v. State*, 172 So. 3d 1112, 1125 (¶20) (Miss. 2015)).

When all the instructions are read together, we find that the jury was adequately instructed on this issue. This assignment of error is not persuasive.

## V. Did the trial court err by instructing the jury as to the definitions of "conceal" and "participate"?

¶31. Barfield contends that the trial court erred by instructing the jury as to the definitions of "conceal," "assist," and "participate." At trial Barfield objected to the definition of "conceal" on the basis that it was misleading. He argues on appeal that this court should find that the trial court committed plain error by giving Instruction S-4. He seems to argue that giving the instruction was error based on the arguments he advances in Parts II and IV above. Because Barfield offered no meaningful argument as to any specific problem with the

17

definitions, he has not shown how he was adversely affected or prejudiced by the definitions. Because he has not cited any relevant authority to support his contention, we find this issue is procedurally barred. *See Walker v. State*, 340 So. 3d 335, 365 (¶101) (Miss. Ct. App. 2021); M.R.A.P. 28(a)(7).

**VI.    Did the trial court err by allowing improper redirect and rebuttal testimony?**

¶32.    Barfield argues that the trial court allowed the State to improperly question Thompson on re-direct examination as to matters that the State had covered in its direct examination and were outside the scope of what was covered in cross-examination. Barfield objected on that basis at trial and the trial judge overruled the objection stating, "You asked him about Mr. Barfield's participation – your objection is overruled."

¶33.    Concerning the scope of redirect examination, the court explained in *Bernard v. State*, 288 So.3d 301, 313 (¶47) (Miss. 2019):

> "The scope of re-direct examination, while largely within the discretion of the trial court, is limited to matters brought out during cross-examination." *Conley v. State*, 790 So. 2d 773, 786 (Miss. 2001) (quoting *Blue v. State*, 674 So. 2d 1184, 1212 (Miss. 1996), *overruled on other grounds by King v. State*, 784 So. 2d 884 (Miss. 2001)). Generally, if a witness's credibility on a matter is questioned during cross-examination, opposing counsel may address that same matter on redirect. *Bell v. State*, 725 So. 2d 836, 849-50 (Miss. 1998); *White v. State*, 976 So. 2d 415, 417-19 (Miss. Ct. App. 2008).

In the present case, Barfield's cross-examination of Thompson covered many of the same facts that were brought out during the State's direct examination. On direct examination, Thompson testified that all three men were involved in the discussions about what to do with the body. They all went together to the pond knowing they were going to place Houston's

body in the pond. When the freezer did not sink, they all went together to Thompson's shop where Kelly obtained the materials he needed to submerge the body. Barfield then went with Thompson to drop Kelly off at the pond so that Kelly could sink the body in the pond. Barfield later saw a portion of the body sticking out of the pond. He told Thompson who then called Kelly to come take care of the situation.

¶34. The leading questions asked on cross-examination covered many of these same actions but were asked in a manner to minimize Barfield's participation in placing Houston's body in the pond. The trial court correctly ruled that questions concerning Barfield's participation were proper on redirect. When the State asked Thompson whether Barfield and Kelly continued to be good friends after the incident, the defense objected that it was outside the scope of cross-examination and the trial court sustained the objection. We find that the trial court properly limited the scope of the redirect examination of Thompson to matters covered during cross-examination.

¶35. After Barfield testified in his own defense, the State re-called Thompson in rebuttal. Barfield did not object to Thompson being recalled to the stand. However, during the State's direct examination of Thompson in rebuttal, Barfield objected that "this was covered under direct examination in the State's case-in-chief." The State responded to the objection by stating "Yes sir, Your Honor, it was. It is proper rebuttal testimony in that it's been refuted in the Defense's case in chief . . . ." The trial judge indicated that he understood and overruled the objection.

¶36. Thompson's rebuttal testimony was brief and did not bring up new matters that were

19

not covered in the State's case-in-chief. However, the testimony was in direct response to Barfield's testimony concerning the events at issue and was offered to rebut Barfield's testimony. *See Willis v. State*, 300 So. 3d 999, 1006 (¶18) (Miss. 2020) ("The State is permitted to present rebuttal testimony . . . to 'explain, repel, counteract or disprove' evidence offered by the defense." (quoting *Williams v. State*, 539 So. 2d 1049, 1051 (Miss. 1989))).

¶37. This is not a situation where new substantive evidence was admitted in rebuttal. It is not a situation where Barfield was not prepared to respond to such testimony. Barfield had the opportunity to cross-examine Thompson and did not seek surrebuttal. The trial judge did not abuse his discretion by allowing Thompson's rebuttal testimony.

**VII. Did the trial court err by allowing the testimony of Broxton and Thompson that they had pled guilty to charges of manslaughter and accessory after the fact to murder, respectively?**

¶38. While Barfield recognizes that there was no objection to their testimony at trial, Barfield contends that the trial court committed plain error by allowing the State's witnesses, Gilmer, Broxton, and Thompson, to testify that they had pled guilty to manslaughter (Broxton and Gilmer) and accessory after the fact to murder (Thompson). Barfield had the opportunity to cross-examine each of these witnesses. In considering a similar argument, this Court held in *Harper v. State*, 102 So. 3d 1154, 1161-62 (¶¶25-26) (Miss. Ct. App. 2012):

> A co-defendant's guilty plea or conviction is generally inadmissible "because such plea of guilty or conviction is no evidence of the guilt of the party being tried." *Buckley v. State*, 223 So.2d 524, 528 (Miss. 1969). However, further analysis is required to determine if plain error occurred. "[A] party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal, because otherwise it is procedurally barred." *Parker v.*

20

*State*, 30 So. 3d 1222, 1227 (¶14) (Miss. 2010). The plain-error doctrine permits the appellate court to review an "obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right.'" *Smith v. State*, 986 So. 2d 290, 294 (¶10) (Miss. 2008).

We cannot find Debra's statement was plain error. Debra testified at trial and was available to be cross-examined on her guilty plea. This Court has suggested that a defendant's opportunity to question a co-indictee regarding his or her guilty plea weighs against a finding of error regarding the admission of evidence regarding those same guilty pleas. *Palm v. State*, 724 So. 2d 424, 426 (¶4) (Miss. Ct. App.1998). In *White v. State*, 616 So. 2d 304, 308 (Miss. 1993), the Mississippi Supreme Court found no reversible error where a co-indictee testified about his involvement in the crime and evidence of the same co-indictee's guilty plea was introduced at trial. Further, Debra pleaded guilty rather than being found guilty by a jury. Evidence of a guilty plea does not carry the same danger of prejudice as evidence of a jury verdict of guilt. *Clemons v. State*, 732 So. 2d 883, 890 (¶29) (Miss. 1999).

¶39. Just as in *Harper*, each of the witnesses here had pled guilty to their part in the death of Houston. The testimony of Broxton and Gilmer was necessary to prove that Houston was murdered, and neither offered any testimony that inculpated Barfield. In any event, just as in *Harper*, we find this issue is procedurally barred because there was no objection at trial. Because we find that the admission of this testimony did not affect Barfield's fundamental or substantive rights or cause a manifest miscarriage of justice, the claim of plain error fails.

**VIII.  Was the verdict against the overwhelming weight of the evidence?**

¶40.    Under this assignment of error, Barfield maintains that an unconscionable injustice has occurred in this case. Without restating any particular argument, he simply states his "prior discussions show [that] the evidence supporting a verdict of guilty was singularly weak and not obtained through a proof of the elements that are required." We have already addressed Barfield's contention that the evidence was legally insufficient. We will now

21

address his claim that the verdict was against the overwhelming weight of the evidence.

¶41. Our standard of review for challenges to the weight of the evidence is set forth in *Wayne v. State*, 337 So. 3d 704, 715 (¶39) (Miss. Ct. App. 2022):

> When reviewing a challenge to the weight of the evidence, the Court will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Jones* [*v. State*], 154 So. 3d [872,] 880 [(¶24) (Miss. 2014)] (internal quotation mark omitted). In making a determination on this issue, "[w]e review the evidence in the light most favorable to the verdict . . . and review the trial court's denial of a motion for a new trial under an abuse-of-discretion standard." *Wilson* [*v. State*], 276 So. 3d [1241,] 1260 [(¶48) (Miss. Ct. App. 2018)] (citation omitted). In so doing, we bear in mind that "[w]hen evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility." *Williams v. State*, 285 So. 3d 156, 160 (¶17) (Miss. 2019).

¶42. Throughout his brief, Barfield maintains that his conviction was improper because he was a mere spectator and that he did nothing to assist anyone in concealing Houston's body. On direct examination at trial, Barfield does not contradict all of Thompson's testimony, but his testimony does conflict with Thompson in several significant areas. Barfield denied that Kelly told him and Thompson about the kidnapping and murder of Houston the first time Kelly came to their residence. Instead, he testified that Thompson and Kelly drove off together. Barfield denied that he and Thompson discussed the "crazy situation" Kelly told about Houston's murder. When Kelly came back that night with a freezer on the back of his truck, Barfield testified that he knew nothing about a body being in the freezer. He said there was no discussion at that time about what to do with the freezer, that Thompson just went and got the forklift. Barfield said Kelly and Thompson got the freezer off the truck and drilled holes in the freezer while he watched. Barfield admits that he walked behind the

22

forklift while Thompson drove it, with the freezer, to the pond. He watched as Thompson and Kelly placed the freezer in the pond, but he did nothing to help them. He continued to watch as Thompson and Kelly got into the pond and tried to put their weight on it to get it to sink. He described that when they brought it back to the bank that they were upset that it would not sink. Barfield denied that there was any conversation about what to do next. According to Barfield, Thompson took the forklift back across the street, and, in Barfield's version of events, when Thompson came back with the Jeep, only Thompson and Kelly went to the shop together. Barfield said he went back to the house. Barfield testified that he never went back to the pond, that he could not see the pond from the residence and that he was not keeping a watch on the pond. Finally, Barfield denied telling Thompson that he saw something floating in the pond and never had a conversation with Thompson or Kelly about seeing something in the pond.

¶43.   On cross-examination, Barfield denied that anyone ever told him that there was a body in the freezer. He only "suspected" something was not right. He thought it was suspicious that they drilled holes in the freezer. He never asked them what they were doing as he watched. He testified that he only "suspected" there was a body in the freezer because there was a freezer on the back of the truck, at night, and they were drilling holes in it. But still, at that point, Barfield maintained that neither Thompson nor Kelly told him what was going on. He never heard either of them say there was a body in the freezer. He never heard anyone say that Kelly had killed Houston. When Kelly opened the freezer before putting it into the pond, a terrible smell came out, and, according to Barfield, that is when he first knew there

23

was a body in the freezer. According to Barfield's testimony, when Thompson and Kelly were trying to sink the freezer in the pond, he knew there was a body in it. Again, Barfield testified that he "never again laid eyes" on that pond after that night. Less than a month later, Barfield moved out of state. When Barfield was interviewed by the Sheriff's department after the body was found, he did not tell them what he knew about the body being placed into the pond. He said it was because "they didn't ask me about it."

¶44. It was for the jury to resolve the conflicts in the testimony of Barfield and Thompson. In *Eubanks v. State*, 341 So. 3d 896, 911(¶48) (Miss. 2022), the supreme court explained:

> [W]hen the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony. This wise rule applies with equal force to the state's witnesses and the appellant's witnesses, including the appellant himself. We have repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the state or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court.

(Citations omitted). The jury heard the evidence, was properly instructed as to the law, and returned a verdict of guilty of accessory after the fact of murder. When viewing the evidence in the light most favorable to the verdict, we do not find that allowing this jury's verdict to stand would sanction an unconscionable injustice.

## CONCLUSION

¶45. We find that the assignments of error raised by Barfield present no reversible error and that his conviction and sentence should be affirmed.

¶46. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE**

24

**AND SMITH, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**McCARTY, J., DISSENTING:**

¶47. Just being present at the scene of a crime—without more—is not a crime. And that is all Justus Barfield ever did here. Since this alone cannot meet the burden of proof required for a conviction of accessory after the fact, I respectfully dissent.

¶48. The proof in this case is not in dispute. James Kelly murdered a man. In an effort to hide the body, he enlisted his friend Caleb Thompson. At this time, Justus Barfield was Thompson's roommate. While Kelly told Thompson the details of the murder, Justus sat by. Kelly then told Thompson he might have somewhere to hide the body. Thompson instead offered, "Well, my pond's across the road, and we can do this," referring to hiding the body in the pond.

¶49. Later that same night, Kelly went back to Thompson's house. At that time, Justus sat in his bedroom "playing Fortnite or Madden" on his Xbox. Kelly and Thompson knocked on his door and told him to "come outside."

¶50. While still in his pajamas, Justus walked outside and noticed there was a deep freezer "on the back of [Kelly's] truck." Thompson "walked up [to the truck] and let the tailgate down." After Kelly and Thompson realized they needed more help with the heavy lifting, Thompson went to "get his loader."

¶51. Justus stayed behind at the house. He would later testify he was not even "sure what a loader was." It was not until Thompson came back that he "realized it was a forklift."

25

Kelly then helped Thompson load the deep freezer onto the forks of the forklift. After loading it, the duo began drilling holes into the deep freezer.

¶52. Meanwhile, in the words of Thompson, Justus did "nothing." He simply stood "five to ten feet" away from the two men as they worked.

¶53. After the freezer was loaded and the holes were drilled, the two men started the journey to the pond, with Thompson operating the forklift. Justus "just walk[ed] along with" the two men, never expressing any desire to help. Nor did the men give any commands or orders to him to do anything or to help.

¶54. Once they got to the pond, Kelly and Thompson together pushed the forklift to the edge of the pond. Having never made any hand gestures or even guided the loader, Barfield just "stood there and observed" the duo as they worked. The two men did it all on their own. Justus still did nothing.

¶55. Thompson waded into the water and waited for Kelly to push the deep freezer in. Then Kelly got in and "pushed [the freezer] farther out." While the two men were in the water, Justus stood on the banks of the pond. Since it was nighttime, he "couldn't see them, but [he] could hear . . . the water splashing." He never got into the water. In fact, according to Thompson, Justus even told him he "wouldn't get into the water."

¶56. After working hard to submerge the freezer, the two men realized it just wouldn't sink. "So they [started] to come back to the bank with the freezer, like one of them pushing and one of them pulling" it. Justus didn't help, and the two men didn't ask him to.

¶57. Angry that their initial plan failed, Thompson took Kelly to get extra tools to attempt

26

to sink the freezer. Thompson "drove his loader back to the house." Once he made it home, he "got his Jeep" and took Kelly across the street to his "new shop" to get the extra tools. Kelly got tarps and straps. Like every other time, Justus didn't touch the tools or help.

¶58. Afterward, Thompson and Justus went back to the house. Kelly stayed with the freezer; he tried to hide it again later that night.

¶59. Days later, Justus "noticed that something had floated up" in the pond. He talked to Thompson about what he saw. Justus didn't take any action or gave any advice about the freezer in the pond. But Thompson did. He called Kelly and told him that he "needed to come back because it was obvious that something was out there." Justus said absolutely nothing to Kelly, nor did he assist him in any way.

¶60. Even though he never acted in any way, Justus was arrested and ultimately convicted as an accessory after the fact to murder. For walking alongside two men as they committed a crime, he was sentenced to twenty years with ten years to serve.

¶61. Our caselaw is well established regarding the sufficiency of evidence. "[T]he critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that *every* element of the offense existed." *Carpenter v. State*, 311 So. 3d 1268, 1275 (¶26) (Miss. Ct. App. 2021) (emphasis added). "When we address a challenge to the sufficiency of the evidence, all credible evidence of guilt must be taken as true, and the State is entitled to all reasonable inferences that may be drawn therefrom." *Id*.

¶62. Furthermore, "[t]his Court *must* reverse and render if the facts and inferences so

considered point in favor of the defendant on *any* element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty." *Washington v. State*, 298 So. 3d 430, 438 (¶27) (Miss. Ct. App. 2020) (emphasis added).

¶63.    Justus was charged under Mississippi Code Annotated section 97-1-5 (Rev. 2014). For the jury to find him guilty as an accessory after the fact to murder, the State had to prove beyond a reasonable doubt that "(1) a completed felony has been committed; (2) . . . the accused *concealed*, *received*, *relieved*, *aided* or *assisted* a felon, knowing that such person had committed a felony; and (3) . . . such aid or assistance was rendered with intent to enable such felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony." *Thompson v. State*, 302 So. 3d 1230, 1233-34 (¶7) (Miss. Ct. App. 2020) (emphasis added).

¶64.    Of those three elements, the *only* one the State proved was the first—that someone was murdered.  But there was no proof Justus aided or assisted either of the two men or that he provided any assistance to them to help them avoid arrest or punishment.  Indeed, the testimony was that he had even declined to help wade into the pond to help push the freezer farther out.

¶65.    Nor did the testimony of one of the two men who did commit a felony support a guilty verdict.  During cross-examination, Thompson testified Justus never actually helped.  And this testimony remained unchanged throughout the entire trial.

> Q.    And Mr. Barfield did not touch the freezer at all; correct?

A.    Correct.

. . . .

Q.    And he didn't pick the pond as the location to put a body in; correct?

A.    Correct.

Q.    He did not choose the tarp or the straps; correct?

A.    Correct.

. . . .

Q.    And, in fact, your testimony is you called - - after some period of time, after this night, you're the one that called and talked to [Kelly] to let him know he needed to come back; correct?

A.    Correct.

. . . .

Q.    So whatever conversation that was had that day, Justus Barfield wasn't conspiring with James Walker Kelly and yourself - -

A.    **To put a body in the pond, no.**

(Emphasis added).

¶66.    Furthermore, Thompson testified under oath Justus didn't even help in the one way someone not physically helping could—by keeping a lookout.

Q.    Justus Barfield wasn't assigned as a lookout to make sure someone wasn't - - was seen out of that house, was he?

A.    No.

¶67.    The majority affirms Barfield's conviction because he "deliberately associated" himself with the crime by "walking" with the two men. But walking is not a crime. The

29

Legislature requires more proof to meet the elements of this crime. Barfield's presence alone does not meet the burden he "concealed, received, relieved, aided or assisted" Kelly or Thompson in hiding the body—especially when all of the evidence says he did nothing at all. *Thompson*, 302 So. 3d at 1233-34 (¶7).

¶68. In sum, there was absolutely no evidence that it was Barfield's plan to hide the freezer in the pond. There is no evidence he assisted in transporting the freezer to the pond. There is also no evidence he assisted in placing the deep freezer into the pond. There is no evidence he got into the water or guided the two men in their efforts to sink the freezer. Furthermore, there is no evidence he stayed in contact with Kelly—the man ultimately responsible for killing a man and hiding his body.

¶69. All we have is undisputed testimony from both Thompson and Justus that he did nothing. Even after the State attempted to elicit testimony to establish Barfield helped the two men, Thompson testified his opinion "doesn't change." He still testified Justus did nothing to help dispose or conceal the body. Indeed, Justus even refused on one occasion to help—telling Thompson he would not get into the pond to help. At that point, he couldn't even see what was going on, since it was dark.

¶70. Without evidence to support Barfield's conviction, "reasonable men could not have found beyond a reasonable doubt the defendant was guilty." *Washington*, 298 So. 3d at 438 (¶27). When presented with a defendant who has neither assisted nor aided in the commission of a felony, the only path is to reverse. One may be convicted of a felony from minimal action, but not from a complete lack of action.

¶71. Because all three elements of accessory after the fact were not proved beyond a reasonable doubt, I respectfully dissent.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**